IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

LUIS A. RIVERA-MELÉNDEZ, et. al.,

Plaintiff,

v.

PFIZER PHARMACEUTICAL, INC.,

Defendant.

CIVIL NO.: 10-1012 (MEL)

**OPINION AND ORDER**

**I.    PROCEDURAL POSTURE**

On August 31, 2010, plaintiff Luis A. Rivera-Meléndez ("plaintiff" or "Rivera") and the conjugal partnership comprised of him and his wife (the "conjugal partnership") filed an amended complaint in the present action against plaintiff's employer, Pfizer Pharmaceuticals, LLC ("defendant" or "Pfizer"), asserting claims pursuant to (1) the Uniformed Services Employment and Reemployment Rights Act ("USERRA"), 38 U.S.C. §§ 4301-4335, and (2) Articles 1802 and 1803 of the Puerto Rico Civil Code, P.R. Laws Ann. tit. 31 §§ 5141-5142  (Dkt. No. 58.)  Defendant filed its answer to the amended complaint on September 3, 2010  (Dkt. No. 66.)  On October 19, 2010, this court dismissed all of the conjugal partnership's claims and plaintiff's Article 1802 and 1803 claims (Dkt. No. 74).  Pending before the court are defendant's motion for summary judgment requesting to dismiss all of plaintiff's remaining USERRA claims and plaintiff's response in opposition. (Dkt. Nos. 108; 109; 115; 116.)

II.     SUMMARY OF UNCONTESTED FACTS.

Luis Rivera-Meléndez has been employed by Pfizer for seventeen years at their pharmaceutical manufacturing facility in Barceloneta, Puerto Rico.  (Dkt. Nos. 108-1, ¶ 1; 115-1, ¶ 1.)  He earned his associates degree in Chemistry from the Technological Institute of Manatí in 1993 and a bachelor's degree in liberal arts from the Pontifical Catholic University at Arecibo in 2010.  (Dkt. Nos. 115-1, P. 12, L. ¶ 9, ¶ 10; 115-3, P. 20, L. 20-22, P. 21, L. 7-16; 121-1, ¶ 1, 9.)  Rivera began at Pfizer as a Chemical Operator Trainee and, after various promotions, became an Active Pharmaceutical Ingredient ("API") Group Leader in 2004.  (Dkt. No. 108-1, ¶ 2; 115-1, ¶ 2.)  He currently works at Pfizer in the API Department as a Service Coordinator.  (Dkt. Nos. 108-1, ¶ 5; 115-1, ¶ 5.)

Rivera is also a member of the United States Naval Reserve ("U.S. Navy").  He has been called to active duty twice during his employment at Pfizer.  (Dkt. Nos. 108-8, P. 224, L. 3.; 115-3, P. 224, L. 3.)  It was Rivera's second tour of duty, from December 5, 2008 to October 21, 2009, that gave rise to the instant controversy.  (Dkt. Nos. 108-1, ¶ 3; 115-1, ¶ 3.)

Plaintiff's Claim for Pre-Deployment Training Pay

On October 11, 2008, plaintiff received an activation notice from the U.S. Navy calling him to serve in Iraq beginning December 5, 2008.  (Dkt. Nos. 108-1 ¶ 10; 115-1, ¶ 10.)  Rivera promptly brought the notice to Lissette Guerra ("Guerra"), Pfizer's Senior Human Resources Specialist, and informed her that he would need to take military leave.  (Dkt. Nos. 108-1 ¶ 11; 115-1, ¶ 11.)  Guerra instructed Rivera to periodically send his military payroll records while on leave in order to calculate the differential pay that Pfizer provides to employees on military leave.  (Dkt. Nos. 108-1, ¶ 12; 115-1, ¶ 12.)  Subsequently, plaintiff received notice from the Navy that he would also need to attend a

pre-mobilization training on November 10, November 12-26, and December 1.  (Dkt. No. 108-1, ¶ 13.)[1]  While this training was part of his deployment orders, the information about the training was not included in the original activation notice that he had shown to Guerra (Dkt. Nos. 108-6, P. 90-94; 115-3, ¶ 91.)  When Rivera informed Guerra about the training and requested paid leave, she asked to see evidence that he was ordered to attend the training to determine whether he was eligible to be compensated for it under Pfizer's policy.  (Dkt. Nos. 108-1, ¶ 14; 108-10, P. 70; 115-1, ¶ 14.)[2]  In her deposition, Guerra clarified that she was not sure if the training was related to his mobilization or whether it was an annual optional training.  (Dkt. No. 108-10, P. 70, L. 7-21.)  If the training were optional, then Rivera would not be entitled to paid leave under Pfizer's military leave policy.  (Dkt. Nos. 108-1 ¶ 14; 115-7, P. 71.)  While plaintiff was at the training in November, he sent Guerra the documentation she had requested, showing the dates of training and its purpose.  (Dkt. Nos. 108-1, ¶ 15; 115-1, ¶ 15.)  Guerra then determined that plaintiff was entitled to pay for the time he attended the training, which he received on or before December 21, 2008.  (Dkt. Nos. 108-1, ¶ 19; Dkt. No. 115-1, ¶ 19.)[3]

---

[1] Plaintiff denies this proposed fact, stating that the training was indeed a pre-requisite required by his mobilization orders.  (Dkt. No. 115-1, ¶ 13).  Plaintiff misunderstands defendant's proposed fact, which is merely that the training orders were not included in the first set of mobilization orders the Navy sent to plaintiff, but were sent subsequently.  (Dkt. No. 108-1, ¶ 13.) This fact is supported by plaintiff's own deposition testimony, which defendant cites, and is thus deemed uncontested.  (Dkt. No. 108-6, P. 90-93.)

[2] Plaintiff admits that Guerra asked for proof regarding the training but adds that she was hesitant to compensate him, she became "irritated or angry" because he sought advice from an attorney regarding his right to compensation, and she questioned why he was so insistent about receiving his military pay.  (Dkt. No. 115-1, ¶ 14.)  To support this statement, plaintiff only cites his amended complaint, which is not record evidence.  (Dkt. Nos. 115-1, ¶ 14; 115-4, ¶ 19, 26.)  Therefore, defendant's proposed fact is deemed uncontested, without plaintiff's proposed addition.

[3] Plaintiff claims that he only received partial payment for those two weeks and that the payment was delayed.  (Dkt. No. 115-1, ¶ 19.)  The evidence that plaintiff points to in the record, however, does not support this claim.  Defendant's proposed fact is therefore deemed uncontested.

<u>Plaintiff's Reinstatement as API Service Coordinator</u>

While plaintiff was serving in Iraq, the API Department at Pfizer's Barceloneta facility underwent a restructuring.  (Dkt. Nos. 108-1, ¶ 20; 115-1, ¶ 20.)  The company's human resources management team decided to eliminate the API Group Leader position and replace it with two separate positions: the API Team Leader and the API Service Coordinator.  (Dkt. Nos. 108-1, ¶ 21; 115-1, ¶ 21.)  Pfizer management met with the API Group Leaders at the plant and informed them that their positions were being eliminated, and that they could apply for one of the seven API Team Leader job openings (Dkt. Nos. 108-1, ¶ 21; 115-1, ¶ 21.)  No employee was guaranteed a position; rather, they had to meet the qualifications and present their job applications in an open, competitive process.  (Dkt. Nos. 108-1, ¶ 22, 29; 115-1, ¶ 29.)[4]  The API Group Leaders were informed that if they did not obtain one of the Team Leader positions, they would have three options: (1) to apply for the Service Coordinator position, that would be created at a later date, (2) to be demoted to the Senior API Operator position, or (3) to participate in a voluntary separation option.  (Dkt. Nos. 108-1, ¶ 21; 115-1, ¶ 21.)  In March 2009, the new job openings were posted, while plaintiff was still on active duty in Iraq.  (Dkt. No. 75.)[5]

According to Pfizer Human Resources employees Camilo Padín-Cruz (" Padín-Cruz") , an HR Senior Specialist, and María del Pilar Sastre, Employee Relations Lead, it is not Pfizer's custom

---

[4] Plaintiff denies defendant's proposed fact, asserting that Pfizer did not present any evidence that it needed to fill the API Team Leader positions with any greater urgency than the API Service Coordinator positions.  (Dkt. No. 115-1, ¶ 22.)  However, plaintiff's assertion does not contradict defendant's proposed fact, which will thus be deemed unopposed.

[5] Defendant states that the Team Leader job opening was posted internally within Pfizer facilities on February 26, 2009.  (Dkt. Nos. 108-1, ¶ 23; 108-3, ¶ 17.)  However, the document referred to in the deposition that supports this statement is the job posting for the Service Coordinator position, not the Team Leader position.  Nonetheless, at the November 1, 2010 status conference, the parties stipulated as a fact not in controversy that the new jobs were posted in March 2009.  (Dkt. No. 75.)

or practice to notify employees on leave about new job openings.  (Dkt. Nos. 108-1, ¶ 24; 108-13, ¶ 8; 108-3, ¶ 17.)  Plaintiff disputes this because, according to his wife, Wanda Otero, Guerra called plaintiff's cell phone in Puerto Rico to inform him that the API Group Leader position was being eliminated.  (Dkt. No. 115-1, ¶ 24, 26.)  Guerra, however, only mentioned the elimination of the Group Leader position; she did not provide any information about the Team Leader job opening and how to apply for it.  (Dkt. No. 115-11, P. 53, L. 18-29, P. 54, L. 6-9.)  Otero, who is also a Pfizer employee, had in fact applied for the Team Leader position and informed plaintiff of this while he was in Iraq.  (Dkt. Nos. 108-1, ¶ 26; 115-1, ¶ 26.)[6]

After he was honorably discharged from active military service, plaintiff contacted Pfizer on October 15, 2009 to request reinstatement, and he returned to work on October 22, 2009.  (Dkt. Nos. 108-1, ¶ 30; 115-1, ¶ 30.)  The parties dispute whether plaintiff was reinstated to his former position as API Group Leader or to a lower-level position.  (Dkt. Nos. 108-1, ¶ 4; 115-1, ¶ 4.)  Defendant's proffered evidence establishes that plaintiff was indeed reinstated to his prior API Group Leader position as far as his official title was concerned; however, because the position had been effectively eliminated, he was assigned to "special projects," which were essentially the duties of the Service Coordinator position to which he would eventually be transferred.  (Dkt. Nos. 108-1, ¶ 4; 108-3, ¶ 21; 108-7, P. 143, L. 16-20, P. 148, L. 12-13; 115-4, P. 57, L. 16-22.)  Plaintiff's salary and benefits remained the same, but he had reduced job responsibilities.  (Dkt. Nos. 108-1, ¶ 33, ¶ 37; 115-1, ¶ 27; 108-7, P. 163.)

---

[6] Plaintiff contests this fact, but in his deposition admitted that he "vaguely remember[ed]" that his wife told him that she "applied for two positions and that [the team leader position] was one of them."  (Dkt. No. 108-7, P. 128, L. 11-24.)

Plaintiff remained an API Group Leader, performing special projects duties while the final details of the Service Coordinator position were decided by Pfizer management. (Dkt. Nos. 108-1, ¶ 34; 115-1, ¶ 34.) Rivera was formally appointed to the Service Coordinator position on May 17, 2010. (Dkt. Nos. 108-1, ¶ 37; 115-1, ¶ 37.) In this position, he also received the same compensation, but fewer responsibilities than he had as an API Group Leader. (Dkt. No. 108-1, ¶ 37; 115-1, ¶ 37; 115-3, P. 164, L. 13-18.) In his deposition, plaintiff stated that he would have liked to have had the opportunity to apply for an API Team Leader position and that he believed he was qualified for the position. (Dkt. Nos. 108-8; 115-3, P. 224, P. 227, L. 5-15, L. 19-24.) In December of 2010, however, a new API Team Leader position became available but Rivera did not apply for it. (Dkt. Nos. 108-1, ¶ 52; 115-1, L. 19-24, ¶.)

<u>Plaintiff's Claim for Benefits of Employment After Reinstatment</u>

Under Pfizer's military policy, plaintiff was entitled to be paid the difference between his military salary and his Pfizer salary if the military pay was lower. (Dkt. No. 108-1, ¶ 39.) While on active duty, plaintiff was paid in accordance with this policy.[7] (Dkt. Nos. 108-1, ¶ 39; 108-7, P. 172, L. 8-24.)

On December 7, 2009, plaintiff sent an e-mail to Padín-Cruz requesting a salary increase for 2009 and a 2009 Christmas bonus, neither of which he had received. (Dkt. Nos. 108-1, ¶ 40; 115-1, ¶ 40.) Subsequently, Rivera received a pay raise retroactive to the date of his reinstatement, October 22, 2009. (Dkt. Nos. 108-1, ¶ 48; 115-1, ¶ 48.) Rivera was informed that he was not entitled to either of the annual Christmas bonuses that Pfizer provides. (Dkt. Nos. 108-1, ¶ 49; 115-1, ¶ 49.)

---

[7] Plaintiff disputes this fact, citing to his amended complaint which states that he experienced delays in receiving his differential pay. (Dkt. No. 115-1, ¶ 39.) Because a pleading is not evidence, this assertion is unsupported and defendant's proposed fact is deemed uncontested.

6

Rivera was ineligible for the annual Christmas bonus mandated by Puerto Rico law ("the statutory bonus") because he had not worked the requisite 700 hours during the past year as required by that law. (Dkt. Nos. 108-1, ¶ 49; 115-1, ¶ 49 .) Defendant claims that Rivera was also ineligible for the one-hundred dollar Christmas bonus provided under Pfizer's Pay Practices Policy ("the Pfizer Christmas bonus") because he was not an "active employee" on September 30, 2009. (Dkt. No. 108-1, ¶ 50.) However, plaintiff points to Pfizer's Pay Practices Policy, which states that the $100 bonus is provided to all active employees as of December 1 of the relevant bonus year. (Dkt. Nos. 115-1, ¶ 50; 108-8, P. 496.) According to Guerra, an active employee is one "who complies with his/her work schedule and who receives compensation for it." (Dkt. Nos. 115-1, ¶ 50; 115-7, P. 50, L. 21-23.)

Plaintiff subsequently initiated the instant action, claiming that Pfizer's delay in granting his differential pay and pay raise, denial of the Christmas bonus, and failure to give him an opportunity to apply for the API Team Leader position were the result of discrimination based on his military obligations in violation of USERRA. (Dkt. No. 58.) Plaintiff also claims that defendant subjected him to a hostile work environment on the basis of his military status. (Dkt. No. 58, ¶ 40.)

## III. Legal Analysis

### A. Summary Judgment Standard

Summary judgment shall be granted when the record shows that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).[8] "A dispute is genuine if the evidence about the fact is such that a reasonable jury could

---

[8]Rule 56 was amended effective December 1, 2010, after the present suit was filed. However, "[t]he substantive standard for summary judgment remains unchanged." Tropigas De P.R. v. Certain Underwriters at Lloyd's of London, 637 F.3d 53, 56 n.5 (1st Cir. 2011). Therefore, since the application of the amended rule to the present case would be "feasible" and would not work an "injustice," Rule 56, as amended, shall govern the determination of the parties' motions. Farmers Ins. Exch., 632 F.3d at 777 n.4 (citing 28 U.S.C. § 2074(a)).

resolve the point in the favor of the non-moving party.  A fact is material if it has the potential of determining the outcome of the litigation.'" Farmers Ins. Exch. v. RNK, Inc., 632 F.3d 777, 782 (1st Cir. 2011) (quoting Rodríguez-Rivera v. Federico Trilla Reg'l Hosp., 532 F.3d 28, 30 (1st Cir. 2008)).  The party moving for summary judgment bears the burden of showing the absence of a genuine issue of material fact.  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).

Once a properly supported motion has been presented before the court, the opposing party "can shut down the machinery only by showing that a trial-worthy issue exists" that would warrant the court's denial of the motion for summary judgment.  McCarthy v. Northwest Airlines, 56 F.3d 313, 315 (1st Cir. 1995).  For issues where the opposing party bears the ultimate burden of proof, that party cannot merely "rely on the absence of competent evidence, but must affirmatively point to specific facts that demonstrate the existence of an authentic dispute."  Id.

In assessing a motion for summary judgment, the court "must view the entire record in the light most hospitable to the party opposing summary judgment, indulging in all reasonable inferences in that party's favor." Griggs-Ryan v. Smith, 904 F.2d 112, 115 (1st Cir. 1990) (citations omitted). The court may safely ignore "conclusory allegations, improbable inferences, and unsupported speculation." Medina-Muñoz v. R.J. Reynolds Tobacco Co., 896 F.2d 5, 8 (1st Cir. 1990) (citations omitted).  However, there is "no room for credibility determinations, no room for the measured weighing of conflicting evidence such as the trial process entails, [and] no room for the judge to superimpose his own ideas of probability and likelihood (no matter how reasonable those ideas may be) . . . ." Greenburg v. P. R. Mar. Shipping Auth., 835 F.2d 932, 936 (1st Cir. 1987); see also Mulero-Rodríguez v. Ponte, Inc., 98 F.3d 670, 677 (1st Cir. 1996) (reversing summary judgment and

emphasizing that "determinations of motive and intent ... are questions better suited for the jury") (quoting Petitti v. New England Tel. & Tel. Co., 909 F.2d 28, 34 (1st Cir. 1990)).

### B.  The Uniformed Services Employment and Reemployment Rights Act of 1994

USERRA is the most recent incarnation of a series of statutes passed to protect veterans' employment and reemployment rights.  See 20 C.F.R. § 1002.2.  Its primary purpose is to "encourage non-career service in the uniformed services by eliminating or minimizing the disadvantages to civilian careers and employment which can result from such service."  38 U.S.C. § 4301(a)(1).  In light of this goal, USERRA aims to "minimiz[e] the disruption to the lives of persons [serving] in the uniformed services as well as to their employers [and] their fellow employees . . . by providing for the prompt reemployment of such persons upon their completion of service," and to "prohibit discrimination against persons because of their [military] service."  38 U.S.C. § 4301(a)(2)-(3).  Because it is a remedial statute, USERRA is to be construed liberally "for the benefit of those who left private life to serve their country in its hour of need."  Fishgold v. Sullivan Drydock & Repair Corp., 328 U.S. 275, 285 (1946).[9]

USERRA contains two components that are relevant to plaintiff's claims.  The first prohibits an employer from denying a service member a promotion or any benefit of employment on the basis of his military status or obligation to serve.  See 38 U.S.C. § 4311.  The second guarantees a service member's reemployment upon return from service.  See 38 U.S.C. § 4312.

---

[9] When Congress enacted USERRA in 1994, it declared that the judicial precedent developed under the Act's predecessor statutes remained "in full force and effect in interpreting its provisions."  H.R. Rep. No. 103-65 at 19, reprinted in 1994 U.S.C.A.N.N. 2449, 2456.  It further emphasized that this was particularly true of the holding in Fishgold, stating that the "anti-discrimination provisions are to be broadly construed and strictly enforced."  H.R. Rep. No. 103-65 at 19, 23.

### 1.  Plaintiff's Claims Under 38 U.S.C. § 4311

Section 4311 of USERRA provides, in pertinent part, that: "[a] person who is a member of [a uniformed service], . . . performs, has performed . . . or has an obligation to perform service in a uniformed service shall not be denied . . . any benefit of employment by an employer on the basis of that membership . . .  performance of service . . .or obligation.  38 U.S.C. § 4311(a).  The term "benefit of employment," means "any advantage, profit, privilege, gain, status, account, or interest . . .  that accrues by reason of an employment contract or . . . an employer policy, plan, or practice and includes . . . awards, bonuses, . . . vacations, and the opportunity to select work hours or location of employment."  38 U.S.C.A. § 4303.  While an employee is absent due to military duty, he is entitled to all benefits that the employer "generally provide[s]" to other employees on leave or furlough, who have similar seniority, status, and pay.  38 U.S.C.  § 4316(b).  After reemployment, the employee is entitled to the seniority, rights, and benefits to which he was entitled on the date he left for active duty, as well as any other seniority or seniority-based rights and benefits that he would have attained if he had remained continuously employed since that date.  38 U.S.C. § 4316(a); 20 C.F.R. 1002.210.  A "seniority-based right or benefit" is one that "accrues with, or is determined by, longevity in employment."  20 C.F.R. § 1002.212.

An employee claiming that he was denied a benefit of employment in violation of USERRA has the initial burden of proving that his military status or obligation to serve was a "motivating factor" for the alleged denial.  38 U.S.C. § 4311(c)(1); see also Velázquez-García v. Horizon Lines of Puerto Rico, 473 F.3d 11, 17-18 (1st Cir. 2007).  The employee must also show that an adverse employment action in fact took place.  Once the employee has made out a prima facie case, the burden then shifts to the employer to prove that the adverse action "would have been taken in the

absence" of the employee's military status or service.  38 U.S.C. § 4311(c)(1); see also Velázquez-García, 473 F.3d at 18.

Plaintiff alleges that he was denied the following benefits of employment: his pay raise for 2009, his 2009 Christmas bonus, and the opportunity to apply for the API Team Leader position. (Dkt. No. 58.)  Plaintiff also makes a hostile work environment claim.  The court will address each of these contentions in turn.[10]

### a.  2009 Pay Raise

Rivera claims that Pfizer denied him a pay raise that he was owed in 2009.  (Dkt. No. 58 ¶ 38.)  However, plaintiff acknowledges that he eventually received the raise retroactive to his reinstatement date of October 22, 2009.  (Dkts. No. 108-1, ¶ 48; 108-7, P. 193, L. 11-20.) Therefore, his only remaining claim is that he did not receive the pay raise while he was on active duty and receiving differential pay from Pfizer.  USERRA, however, does not mandate an employer to pay differential pay.  See Gross v. PPG Industries, Inc. 636 F.3d 884, 889 (7th Cir. 2011).  It only requires that if the employer does provide differential pay to all employees on leave, then it must do so in the same manner for employees on military leave.  See id.; see also 38 U.S.C. § 4316(b)(1)(B) (requiring an employer to provide employees on active duty with the same benefits as employees on furlough or leave of absence).  Plaintiff has not provided any evidence that Pfizer gave pay raises to other similarly situated employees also on leave.  To the contrary, plaintiff admitted that other employees who were present at Pfizer complained because they had not received their pay raises.

---

[10] Plaintiff also claims that defendant hesitated to compensate him for his two weeks of pre-deployment training and delayed providing the compensation he eventually received.  (Dkt. No. 58 ¶ 25-29.)  Assuming *arguendo* that this constitutes the denial of a benefit of employment, plaintiff does not successfully contest defendant's supported proposed fact, showing that defendant was properly compensated for the training.  See, supra, note 3; (Dkt. Nos. 108-1, ¶ 19; 115-1, ¶ 19.)

(Dkt. No. 108-7, P. 197, L. 11-24, P. 198 L. 1.)  Plaintiff therefore was not denied a benefit of employment in violation of USERRA and his claim as to the 2009 pay raise is dismissed.

### b. 2009 Pfizer Christmas Bonus[11]

According to Pfizer's Puerto Rico Region Pay Practices Policy ("the Policy"), active employees on December 1 of the relevant bonus year who do not qualify for the statutory bonus  are entitled to a one hundred dollar Christmas bonus.  (Dkt. No. 108-8, P. 31.)  While the policy (as per the document provided to this court) does not define "active employee," Guerra explained that it means an employee "who complies with his/her work schedule and who receives compensation for it."  (Dkt. No. 115-7, P. 50, L. 21-23.)  Additionally, plaintiff's supervisor, Jorge Belgodere, stated that plaintiff was indeed an active employee from October 22, 2009 through December 31, 2009. (Dkt. No. 115-4, P. 216, L. 6-10.)

In its statement of proposed facts, defendant contends that plaintiff is ineligible for the bonus because he was not an active employee on September 30, 2009.  (Dkt. No. 108-1, ¶ 50.)  Defendant also submitted an affidavit from Padín-Cruz stating that eligibility for the Christmas bonus was determined as of September 20, 2009.  (Dkt. No. 108-13, ¶ 18.)  However, this  contradicts the Policy submitted, which states that eligibility is determined as of December 1 of the relevant bonus year.  (108-8, P. 31.)  Therefore, there appears to be a basis to conclude that plaintiff was wrongfully deprived of his one hundred dollar Christmas bonus.

Plaintiff must now prove that his military status or obligation to serve in the military was a "motivating factor" for this adverse employment action.  Evidence of motivation need not be direct,

---

[11]In view that plaintiff is not contesting that he had not worked the requisite 700 hours during the relevant time period as required by Puerto Rico law and appears to concede that he does not qualify for the statutory bonus, the court will only address the Pfizer $100 Christmas bonus.

and may be inferred from a variety of factors, including: "proximity in time between the employer's military activity and the adverse employment action, inconsistencies between the proffered reason and other actions of the employer, an employer's expressed hostility towards members protected by the statute together with knowledge of the employee's military activity, and disparate treatment of certain employees compared to other employees with similar work records or offenses." Conners v. Billerica Police Dept., 679 F. Supp. 2d 218, 226 (D. Mass. 2010) (citing Sheehan v. Dept. of the Navy, 240 F.3d 1009, 1014 (Fed. Cir. 2001)).  Here, there is no evidence of defendant's hostility towards or disparate treatment of employees who served in the military.  On the other hand, defendant denied plaintiff's Christmas bonus in December 2009, only two months after he returned from active duty.  (Dkt. No. 108-1 ¶ 49-50; Dkt. No. 115-1, ¶ 49-50.)  Additionally, defendant's proffered reason for denying the bonus is inconsistent with its stated policy (Dkt. No. 108-1, ¶ 50; 108-8.)  Therefore, a reasonable jury could find that the motivation for denying the bonus was, in fact, plaintiff's absence due to his military service–especially in light of the mandate that USERRA's anti-discrimination provisions are to be liberally construed.  H.R. Rep. No. 103-65 at 19, 23. Defendant's motion for summary judgment on plaintiff's claim for the one-hundred dollar Christmas bonus is thus denied.

### c. Opportunity to Apply for the API Team Leader Position

Plaintiff claims that the opportunity to apply for the Team Leader position was a "benefit of employment" and, as such, USERRA required Pfizer to notify him of the job opening so that he could submit an application.  While plaintiff was on military leave, Pfizer was only required to provide him with the rights and benefits that it generally grants to other similarly situated employees on leave or furlough.  38 U.S.C. § 4316(b)(1)(B).  Defendant's human resources employees stated

that it is not Pfizer's policy or practice to contact employees on leave about new job openings. (Dkt. Nos. 108-1, ¶ 24; 108-13, ¶ 8; 108-3, ¶ 17.) Plaintiff attempts to contradict this evidence with testimony from his wife, stating that Guerra called his cell phone in an attempt to inform that his API Group Leader position was being eliminated. (Dkt. No. 115-1, ¶ 24, 26.) Plaintiff, however, does not proffer any evidence showing that Guerra intended to tell him about the new API Team Leader positions and how to apply for one. (Dkt. No. 115-11, P. 53, L. 18-29, P. 54, L. 6-9.) Moreover, plaintiff's proof that Guerra called the plaintiff is only evidence of one isolated incident; it does not establish that Pfizer has a general policy or practice of contacting absent employees to inform them about department restructuring generally, or about new job openings specifically. Cf. Chang v. Univ. of R.I., 606 F. Supp. 1161 (D.R.I. 1985) ("[I]solated incidents, without more, do not constitute a pattern or practice.") Plaintiff, therefore, has not shown that he was deprived of a benefit that Pfizer provides to other similarly situated employees who are on leave, and his claim regarding the opportunity to apply for the API Team Leader position is thus dismissed.[12]

### d. Hostile Work Environment

"Neither the Supreme Court nor any court of appeals has decided whether a hostile work environment claim is cognizable under USERRA." Vega-Colon v. Wyeth Pharmaceuticals, 625 F.3d 22, 32 (1st Cir. 2010) However, even if this court were to decide that it does, plaintiff would not prevail on this claim. To make out a hostile work environment claim, plaintiff must demonstrate "harassing behavior 'sufficiently severe or pervasive to alter the conditions of [his] employment.'"

---

[12]Plaintiff has not brought to the court's attention any statute, regulation or precedent to support the view that "similarly situated employees" should be construed as meaning similarly situated in job title and responsibilities only, but not as to leave status.

Id. (quoting Penn. State Police v. Suders, 542 U.S. 129 (2004)).  Plaintiff has provided no evidence of harassing behavior by defendant.

In his opposition to defendant's motion for summary judgment, plaintiff claims that defendant showed discriminatory animus toward him because Guerra expressed "reservations" when he asked for military leave and compensation for the pre-deployment training.  (Dkt. 116, P. 10.) Mere hesitation to confirm an employee's eligibility under a company policy is not harassing behavior.  Plaintiff further states that Guerra "became angry or irritated" with him for seeking legal advice about his military leave.  Plaintiff, however, cites no support for this allegation apart from his amended complaint.  (Dkt. No. 116, P. 10.)

Plaintiff also claims that he received a negative employee evaluation in 2009 based on his unavailability to work at Pfizer during that year, and that his 2008 employee evaluation was more favorable.  (Dkt. No. 116, P. 11.)  First of all, the document that plaintiff refers to is in Spanish, and no English translation has been provided.  (Dkt. No. 115-16.)  Therefore, under Local Rule 5(g), this document is not considered part of the record.[13]  Plaintiff further asserts that when his supervisor, Jorge Belgodere ("Belgodere"), was asked in his deposition whether plaintiff's "absence due to his obligation to serve put any stains upon his work," he replied "of course."  (Dkt. Nos. 115-1, ¶ 8; 116, P. 11.)  Plaintiff misquotes and takes out of context the deposition testimony.  Belgodere was asked whether Rivera's absence put any "strains upon you, your work schedule, [or] upon any other employee work schedule . . . ?"  (Dkt. No. 115-4, P. 181, L. 21-22.) (emphasis added).  Belgodere

_____

[13] The court notes, however, that the evaluation observes that Rivera was on military leave for most of 2009 and as such, "his presence in the plant was minimal; however, it is understood that he met the expectations of the position that he occupied."  (Dkt. No. 115-16.)  (translation ours).  This is hardly a negative evaluation.  Nevertheless, this evaluation will not be taken into account.  See Aguiar-Carrasquillo v. Agosto-Alicea, 445 F.3d 19, 24 (1st Cir. 2006) ("In the past, we have refused to consider materials submitted to the court in any language other than English, and we continue to do so.")

responded: "Of course at [sic] the other group leaders that were supporting the other site needed to provide a little bit more support to Eddie Berríos [who had taken over plaintiff's Group Leader duties] . . . ."  (Dkt. No. 115-4, P. 182, L. 2-4.)  This is not a negative reflection on plaintiff's absence.

Finally, plaintiff claims that his "perception of the discriminatory animus" toward him was so severe that he felt that if he were to apply for the API Team Leader position that was available in December 2010, "and it went through Camilo Padín's hands, I felt I wasn't going to receive fair treatment even if I had the qualifications."  (Dkt. No. 116, P. 12.)  However, plaintiff's subjective perception is not sufficient to establish a hostile work environment claim.  Rather, this perception must be based on some objectively offensive conduct.  See Vega-Colon, 625 F.3d at 32.  The only allegedly offensive conduct by Padín-Cruz that plaintiff mentions is that "he made a face as if he were upset and I felt intimidated," when plaintiff was having a conversation with him.  (Dkt. No. 115-3, P. 204, L. 6-8.)  No rational jury could find that this conduct rises to the level of a hostile work environment claim.

Plaintiff has produced no other evidence of harassment, abuse, or mistreatment by his superiors or colleagues at Pfizer.  Therefore, plaintiff's hostile work environment claim is dismissed.

### 2.  Plaintiff's Claims Under 38 U.S.C. § 4312

In order to invoke the protection of USERRA's reemployment provisions, a plaintiff must show that he fulfills five requirements: (1) his absence was due to military service, (2) he gave notice to his employer that he was leaving to serve in the military, (3) the cumulative period of military service with that employer did not exceed five years, (4) the employee was honorably discharged,

and (5) the employee timely requested reinstatement.  38 U.S.C. § 4312.  The parties do not dispute that plaintiff met these requirements.

If the employee meets these criteria, the employer must promptly reemploy him in the "position of employment in which the person would have been employed if [his] continuous employment with the employer had not been interrupted by such service, or a position of like seniority, status and pay . . . ."  38 U.S.C. § 4313(a)(2)(A).  This is referred to as the escalator position, and is intended to provide the employee with any seniority-based promotions that he would have obtained "with reasonable certainty" had he not left his job to serve in the armed forces.  20 C.F.R. § 1002.191.  If there is no escalator position, then the employer must employ the veteran "in the position of employment in which the person was employed on the date of the commencement of the service in the uniformed services, or a position of like seniority, status and pay . . . ."  38 U.S.C. § 4313(a)(2)(B); 20 C.F.R. § 1002.197.

Upon his return to Pfizer, plaintiff was reinstated to his former position as an API Group Leader, but his responsibilities were essentially those of an API Service Coordinator.  Several months after his return he was in fact transferred to the Service Coordinator position.  The question, thus, is whether the Service Coordinator position met USERRA's reemployment requirements.

Plaintiff argues that he was entitled to be employed in an API Team Leader position because he would have attained that position with reasonable certainty had he not left Pfizer.  (Dkt. No. 116, P. 14.)  However, the reference to the escalator position is inapplicable here because the Team Leader position was not an escalator position.  An escalator position is a promotion that is based solely on employee seniority.  See 20 C.F.R. §§ 1002.191, 1002.213.  It does not include an appointment to a position that is not automatic, but instead depends on the employee's "fitness and

ability" and the employer's "exercise of discretion." <u>McKinney v. Missouri-Kansas-Texas Railroad Co., et. al.</u>, 357 U.S. 265, 271 (1958) (interpreting predecessor provision in Universal Military Training and Service Act of 1951). The Team Leader position was a new position produced by an internal reorganization, not an automatic promotion based on seniority. (Dkt. Nos. 108-1, ¶ 20-21, 29; 115-1, ¶ 20-21, 29.) Applicants were evaluated for the position based on their skills and qualifications and were selected at the management's discretion. (Dkt. Nos. 108-1, ¶ 29; 115-1, ¶ 29.) Therefore, USERRA did not require Pfizer to place plaintiff into a Team Leader position because it was not an escalator position.

Moreover, the purpose of the escalator principle is to "assure that those changes and advancements that would necessarily have occurred simply by virtue of continued employment will not be denied the veteran because of his absence in the military service." <u>McKinney</u>, 357 U.S. at 271. If plaintiff's employment with Pfizer had not been interrupted by his military service he may or may not have been selected as an API Team Leader, no matter how qualified he may have been, as this was a matter of managerial discretion. USERRA does not require Pfizer to reproduce the opportunity that plaintiff may have had to apply for the Team Leader position because it "does not guarantee the returning serviceman a perfect reproduction of the civilian employment that might have been if he had not been called to the colors . . . [nor] that the past with all its possibilities of betterment will be recalled." <u>Id.</u> at 271-72. Nor does it require defendant to place him in this position as the "statute does not envisage overriding an employer's discretionary choice by any such mandatory promotion." <u>Id.</u>

Accordingly, USERRA only entitles plaintiff to reemployment in the position he had prior to his service or a position of "like seniority, status, and pay." 38 U.S.C. § 4313(a)(2)(A). The

parties agree that the Service Coordinator position provides Rivera the same salary and benefits that he had as an API Group Leader.  (Dkt. No. 108-1, ¶ 31, 37.)  Moreover, there is no indication that Rivera lost the seniority he had prior to service, so it can be inferred that he maintained his seniority in the Service Coordinator position.  The only point of contention, then, is whether the Service Coordinator position was of the same status as the Group Leader position.

The term "status" is not defined in USERRA and so should be accorded its ordinary and common meaning.  Duarte v. Agilent Technologies, 366 F. Supp. 2d 1039, 1045 (D. Colo. 2005). Additionally, the regulations governing the federal government's reemployment obligations under USERRA are instructive, and define "status" as "the particular attributes of a specific position . . . includ[ing] the rank or responsibility of the position, its duties, working conditions, pay, tenure, and seniority.  5 C.F.R. § 353.102(2).  The parties agree that plaintiff has reduced responsibilities in the Service Coordinator position.  (Dkt. Nos. 108-1, ¶ 37; 115-3. P. 164, L. 16.)  Neither party has presented evidence showing that any of the other attributes of the Service Coordinator position differ from those of the Group Leader position.  Plaintiff suggests that he may have had more supervisory duties as a Group Leader, stating that "when the supervisor wasn't in, I assumed the role of supervisor.  I was in charge of the safety, the processes, the personnel."  (Dkt. No. 115-3, P. 164, L. 2-9) The record does not indicate how often plaintiff assumed these supervisory duties.

It is unclear, then, from the record exactly how much the Service Coordinator job differs in status from the Group Leader position but it appears that it is not equivalent.  USERRA, however, contains an exception for employers who are unable to reemploy a veteran in their previous job or one of like seniority status and pay.  See 38 U.S.C. § 4312(d)(1)(A).  If an employer can demonstrate that its "circumstances have so changed as to make such reemployment impossible or unreasonable,"

this constitutes a complete defense to its reemployment obligations under USERRA.  38 U.S.C. § 4312(d)(1)(A).  This limited exception was "intended to provide for cases where necessary reduction of an employer's operating force or discontinuance of some particular department or activity would mean simply creating a useless job in order to reemploy the plaintiff,"  Kay v. General Cable Corporation, 144 F.2d 653, 655 (3d Cir. 1944), or "where there has been a reduction in the work force that would reasonably have included the veteran."  David v. Halifax County School System, 508 F. Supp. 966, 969 (E.D.N.C. 1981).

When an internal reorganization results in the elimination of the veteran's position, the employer must still make an effort to offer the veteran a similar position.  See Houghton v. Texas State Life Ins. Co., 166 F.2d 848, 850 (5th Cir. 1948); Ruesterholtz v. Titeflex, Inc., 166 F.2d 335 (3d Cir. 1948).  However, in determining whether the offered position is satisfactory, the USERRA regulations recognize that it "may be affected by changes in staffing or work priorities.  Woodard v. N.Y. Health & Hospitals Corp., 554 F. Supp. 2d 329, 356 (E.D.N.Y. 2008); see also 20 C.F.R. § 1002.194 ("The reemployment position may involve transfer to another shift or location, more or less strenuous working conditions, or changed opportunities for advancement. . . .").

In this case, it would have been impossible for defendant to reemploy plaintiff in his former position because it no longer existed.  Still, defendant did make an effort to place him in a similar position, where he maintained the same salary, benefits, and working environment.[14]  The only attributes that changed were his responsibilities, which were reduced to some degree.  Plaintiff maintains the same opportunities for advancement, evidenced by the fact that he could have applied for the API Team Leader position that became available in December 2010.  (Dkt. No. 108-1, ¶ 52.)

---

[14]Plaintiff has not identified any other alternate position to the API Team Leader position that has a similar status as his former API Group Leader position.

Therefore, no rational jury could find that defendant has not discharged its reemployment responsibilities under USERRA and, accordingly, plaintiff's reemployment claim is dismissed.

## IV.    CONCLUSION

In view of the foregoing, defendant's motion for summary judgment is hereby GRANTED IN PART and DENIED IN PART, as follows: defendant's motion for summary judgment is DENIED as to plaintiff's claim regarding the one-hundred dollar Pfizer Christmas bonus, but GRANTED as to all of plaintiff's remaining claims which are hereby DISMISSED WITH PREJUDICE.

IT IS SO ORDERED.

In San Juan, Puerto Rico, this 21st day of October, 2011.

s/Marcos E. López
U.S. Magistrate Judge
